IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 13, 2020 Session

## LOUISE HELEN PACK DOVER v. NORRIS LEE DOVER

**Appeal from the Chancery Court for Knox County**

**No. 172548-2      Clarence Pridemore, Jr., Chancellor**

_____

### No. E2019-01891-COA-R3-CV
_____

Following a bench trial, the Chancery Court for Knox County ("trial court") granted the divorce of Louise Helen Pack Dover ("Wife") from Norris L. Dover ("Husband") on the basis of inappropriate marital conduct. The trial court classified several real properties, largely purchased by Husband before the marriage, as Husband's separate assets and concluded that no transmutation occurred during the marriage. The trial court also classified Husband's 401(k), which was established before the marriage, as a marital asset and ordered the parties to divide it equally. The trial court then awarded Wife alimony in solido in the amount of $5,000.00 per month for thirty-six months. We conclude that the trial court erred in the classification of the real properties at issue as well as its classification of Husband's 401(k). Because the division of marital property will change substantially as a result of this opinion, we vacate the trial court's division of the parties' marital estate and the alimony award. We therefore reverse in part, affirm in part, vacate in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part, Affirmed in Part, Vacated in Part and Remanded for Further Proceedings**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and KENNY W. ARMSTRONG, J., joined.

Jerrold L. Becker and Emily K. Stulce, Knoxville, Tennessee, for the appellant, Norris L. Dover.

Allison Easterday Alexander and Haleigh E. Chastain, Knoxville, Tennessee, for the appellee, Louise Helen Pack Dover.

# OPINION

## Background

Husband and Wife married in June of 2000 and have two children.[1] Wife has a high school diploma but does not have a college degree. Before the marriage, Wife worked briefly in advertising and then in interior design, but she left full-time employment after the birth of the parties' son in June of 2002. Since then Wife has worked sporadically in interior design, but it is undisputed that Wife served as the primary caregiver to the parties' children and did not earn significant income during the marriage. Husband, on the other hand, graduated from medical school in the 1980's and began a lucrative career as an anesthesiologist with Parkwest Medical Center[2] ("Parkwest") in 1986.

Husband purchased a home in Farragut, Tennessee in 1989 (the "Lookout Point residence"), and this is the home in which the parties resided together until they separated in 2010. Husband bought the home for $339,000.00, and the parties agree that it was fully paid off three years into the marriage, in 2003. The only remaining debt on the Lookout Point residence is a home equity line of credit ("HELOC") that was taken out by Husband in 2002 and by the time of trial had an outstanding balance of $145,000.00. In addition to the Lookout Point residence, Husband purchased property in Burnsville, North Carolina (the "Cabin") in 1993 for approximately $150,000.00. When Husband bought the property, there was a structure on it that was being used as a barn by the previous owner, although it is not entirely clear from the record what state this structure was in before the marriage. Husband testified, however, that the structure "was not a house then." Husband owns additional residential property in Burnsville, North Carolina (the "Church Street property"), and has an ownership interest in two other properties in the same area; however, no issues on appeal pertain to the two additional properties. Further, Husband began a 401(k) through his employment prior to the marriage, although the record does not conclusively establish the balance of that account at the time of the marriage.

During the marriage, Wife cared for the parties' children while Husband worked long hours, often working every day for two weeks straight on twelve to fourteen-hour shifts. The parties enjoyed a very comfortable lifestyle, with Husband at times earning over $900,000.00 per year. Husband's paychecks were deposited into the parties' joint bank account, which both Husband and Wife used to pay household expenses. Early in the marriage, the parties used money from their joint bank account to extensively renovate the Lookout Point residence. Likewise, the parties undertook extensive improvements to the Cabin, such as adding additional floors and a full kitchen. Total improvements to the Cabin cost approximately $429,000.00, and the Cabin appraised at $440,000.00. Like the

---

[1] No issues regarding custody or support of the children are disputed on appeal.

[2] At different points in the record, the parties refer to Husband's employer as Parkwest, Covenant, and Anesthesia Medical Alliance of East Tennessee. For ease of reference, we refer to Husband's employer in this opinion as "Parkwest."

Lookout Point residence, the funds for the improvements to the Cabin came from the parties' joint checking account, and Wife was very involved in the renovations. Husband testified at trial that the purpose of improving the Cabin was to use it as a vacation home for the family, and Wife confirmed that the parties often took the children to the Cabin for weekends and when Husband had time off.

The final real property at issue, the Church Street property, was originally purchased by Husband and Husband's brother in March of 2000, shortly before the parties married. Husband contributed money towards the down payment, and the deed reflects that Husband at that time had an undivided one-half interest in the property. In November of 2000, however, approximately five months after the parties married, the parties used $65,000.00 in marital funds to pay off the remainder of the mortgage and acquire the Church Street property in full. The parties then used approximately $150,000.00 of marital funds to substantially improve the Church Street property.

Wife originally filed for divorce from Husband in 2008; however, the parties reconciled and remained living together in the Lookout Point residence until October of 2010. Wife maintains that Husband was physically and emotionally abusive to her and the children throughout the marriage, and she testified at trial that a violent episode in October of 2010 prompted Wife to reinitiate divorce proceedings. Husband answered Wife's complaint on October 28, 2010 and counterclaimed for divorce on the bases of irreconcilable differences and inappropriate marital conduct. An ex parte order of protection was entered against Husband on October 25, 2010, and later in the proceedings, Husband agreed to a lifetime order of protection. As a result of the abuse allegations by Wife, Husband was asked to leave his medical practice.[3] Husband has not worked since 2010 despite having interviewed for and considered several jobs. Husband testified at trial that at one point he hoped for reconciliation with his family and did not want to return to work because he thought the demanding hours might interfere with the reconciliation. With regard to another potential job, Husband testified that he did not accept because of the risk of liability for malpractice. Husband's anesthesiology license lapsed in 2012, and Husband has not sought any employment since that time. Likewise, Wife never resumed working full-time outside the home and remains the sole caretaker of the parties' children. While Husband engaged in some limited supervised visitation with the children for a period of time after the parties separated, by the time of trial Husband had not seen the children in several years.

An agreed order for pendente lite support was entered on December 16, 2011, in which Husband agreed to pay $5,000.00 per month in child support, $4,000.00 per month in spousal support, property taxes on all of the real properties, the homeowner's insurance

---

[3] Specifically, Husband testified that he was told by Parkwest that he could either retire, resign, or be fired after his employer discovered the order of protection.

on the Lookout Point residence,[4] car insurance on all of the parties' vehicles, the HELOC payments due on the Lookout Point residence, utilities and other expenses related to the North Carolina properties, all tuition and expenses related to the children's private school, boarding fees for the parties' horses, and all out-of-pocket medical or dental expenses for the children. Wife was ordered to pay her personal living expenses, utilities and maintenance expenses at the Lookout Point residence, her own medical and health related bills, and any recreational and/or therapeutic expenses for herself and the children. Since this order was entered, Husband has paid Wife $9,000.00 every month in support plus $1,000.00 per month for the children's private school tuition. However, on at least one occasion, the trial court found that Husband had willfully disobeyed court orders and ordered Husband to pay Wife's attorney's fees arising from the resultant motions. Further, Husband had to be ordered twice by the trial court to complete Wife's discovery requests. Consequently, this case became significantly protracted, and by the time of trial the parties had been living apart for almost seven years.

A bench trial occurred over several days in 2017, concluding on May 1, 2017. Several witnesses testified, including the parties. Wife's proof largely showed that Wife's contributions to the marriage came in the form of caring for the parties' children and maintaining the household. Wife testified that she earned money from interior design jobs sporadically but that she would cancel jobs when they interfered with the children's busy schedules. Because Father no longer has any contact with his children, Mother is their sole caretaker, and she testified that her days are consumed with their various activities. Both children are heavily involved in sports, and Wife and both children travel several weekends out of each month for the son's travel baseball league. The son's therapist testified that son's heavy involvement in sports is imperative to his mental health, which suffered significantly as a result of witnessing Husband's abuse of Wife. Wife also offered proof regarding the renovations to the Lookout Point residence, the Cabin, and the Church Street property in furtherance of her theory that the properties, although largely purchased by Husband before the marriage, transmutated into marital property during the marriage.

In contrast, Husband testified that he did not intend for any of the real properties to be marital, that they are all titled in his name only, and that Wife's credit was not used to finance or renovate any of the properties. It was undisputed, however, that all three properties underwent renovations with funds from the parties' joint bank account during the marriage and that expenses for all properties were also paid out of the joint bank account. Both parties maintained at trial that they are incapable of holding full-time employment; Wife because she is nearing retirement age and is the sole caregiver for the parties' children, and Husband because of the mandatory retirement age for anesthesiologists, which Husband testified is 65.[5]

---

[4] Wife and the children have resided in the Lookout Point residence during the pendency of this case.

[5] Husband was 63 at the time of trial. Wife was 54.

The trial court entered its initial findings of fact and conclusions of law on November 30, 2017. The trial court noted that Husband and Wife now have equal income-earning ability because while Wife has no college degree and very little work experience, Husband is unable to continue in anesthesiology due to the mandatory retirement age. Nonetheless, the trial court cited the domestic abuse by Husband and found that Husband was largely at fault for the divorce. The trial court awarded Wife $5,000.00 in alimony per month for thirty-six months. Wife was also awarded half of the funds that remained in the parties' joint bank account, which at the time of trial had a balance of $255,000.00.[6]

With regard to the real properties, the trial court found that both the Lookout Point residence and the Cabin were Husband's separate property and that no transmutation had occurred. However, because both properties were renovated during the marriage, the trial court awarded Wife one-half of the cost of the renovations for each property. Husband was ordered to remain responsible for the HELOC on the Lookout Point residence.[7]

Addressing the Church Street property, the trial court noted that $65,000.00 in marital funds was used to fully acquire the property and that an additional $150,000.00 in marital funds was used to renovate the property. Ultimately, however, the trial court classified the Church Street property as Husband's separate asset and held that Wife is not entitled to any share of this property. As to Husband's 401(k), the trial court classified the account as a marital asset and ordered the parties to divide it equally. The amount of the 401(k) at the time of trial was approximately $1,391,308.85. The trial court also found that Husband did not dissipate the parties' marital assets during the period of separation before trial, despite the proof showing that Husband engaged in high-risk stock trading after the parties separated. Finally, the trial court ordered both parties to pay their own attorney's fees.

Although the trial court entered its initial findings of fact and conclusions of law in November of 2017, the issue of child support was left outstanding and was referred to a child support magistrate. Consequently, a final order could not be entered, and the case languished. Both parties filed post-trial motions. Husband essentially asked the trial court to amend its findings of fact and conclusions of law as to Husband's 401(k) and to reconsider its alimony award to Wife. Wife asked the trial court to alter or amend its classification of the Lookout Point residence, the Cabin, and the Church Street property as Husband's separate assets. Additionally, Wife asked the trial court to enter a judgment against Husband for $127,500.00 based on the fact that after trial, but before a final judgment could be entered, Husband spent the remaining funds in the parties' joint bank

---

[6] Wife testified that she was not allowed access to the joint account after the separation and that she depends on Husband to send her support payments.

[7] It is undisputed that funds from the HELOC were not actually used to improve the Lookout Point residence; rather, the parties used the HELOC to pay other expenses such as buying cars, paying off outstanding bills from Wife's previous divorce, and investing in the stock market.

account, which was a marital asset but to which Wife had not had access since the parties separated. Wife later made the same request with regard to Husband's 401(k), arguing that since trial, Husband had withdrawn $163,000.00 from the account. Wife asserted she was entitled to an offset of $163,000.00.

The trial court heard arguments on the parties' motions and entered amended findings and conclusions on November 20, 2018. However, the trial court's decision regarding the alimony, the 401(k), and the division of real property did not change. On September 26, 2019, the trial court entered the final decree of divorce in which it denied all outstanding motions and declined to award Wife any offsets for Husband's post-trial spending. Husband timely appealed to this Court.

## Issues

Husband raises two issues on appeal:

1. Whether the trial court erred in awarding Wife $5,000.00 per month for thirty-six months in alimony.

2. Whether the trial court erred in classifying Husband's 401(k) as a marital asset and dividing it equally between the parties.

Wife also raises a host of issues on appeal, which are slightly restated as follows:

3. Whether the trial court erred in classifying the Lookout Point residence as Husband's separate property.

4. Whether the trial court erred in classifying the Cabin as Husband's separate property.

5. Whether the trial court erred in classifying the Church Street property as Husband's separate property.

6. Whether the trial court erred in declining to award Wife alimony in futuro.

7. Whether the trial court erred in concluding that Husband did not dissipate the parties' marital assets.

8. Whether the trial court erred in denying Wife's motion for an additional award of $127,500.00 based upon Husband's withdrawal of funds from the parties' joint checking account between trial and the entry of the final decree of divorce.

9.     Whether the trial court erred in denying Wife's motion for an additional award of $163,000.00 based upon Husband's withdrawal of funds from his 401(k) between trial and the entry of the final decree of divorce.

10.    Whether the trial court erred in declining to award Wife her attorney's fees at trial.

11.    Whether Wife is entitled to her attorney's fees incurred on appeal.

## Discussion

### A. Classification and Division of Property

#### 1. Classification

The bulk of the issues on appeal deal with the trial court's classification and division of the parties' assets. "Trial courts are vested with a great deal of discretion when classifying and dividing the marital estate, and their decisions are entitled to great weight on appeal." *Eldridge v. Eldridge*, 137 S.W.3d 1, 12 (Tenn. Ct. App. 2002). As such, this Court will not interfere "unless the [trial] court's decision is contrary to the preponderance of the evidence or is based on an error of law[.]" *Id.*

It is helpful to begin with a brief overview of our divorce jurisprudence. As a "dual property" state, Tennessee distinguishes between separate property and marital property. *Id.* (citing *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988)). In a divorce action, only marital property is subject to division between the parties. *Id.* at 13 (citing Tenn. Code Ann. § 36-4-121); *see also Keyt v. Keyt*, 244 S.W.3d 321, 328 (Tenn. 2007) ("[C]ourts do not have the authority to make an equitable distribution of separate property[.]" (citing *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995))). It is therefore "of primary importance for the trial court to classify property as separate or marital" before it can equitably divide the property between the parties. *Eldridge*, 137 S.W.3d at 12–13 (citing *Brock v. Brock*, 941 S.W.2d 896, 900 (Tenn. Ct. App. 1996)).

Separate property is:

(A) All real and personal property owned by a spouse before marriage, including, but not limited to, assets held in individual retirement accounts (IRAs) as that term is defined in the Internal Revenue Code of 1986 (26 U.S.C.), as amended;

(B) Property acquired in exchange for property acquired before the marriage;

(C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1);

(D) Property acquired by a spouse at any time by gift, bequest, devise or descent;

(E) Pain and suffering awards, victim of crime compensation awards, future medical expenses, and future lost wages; and

(F) Property acquired by a spouse after an order of legal separation where the court has made a final disposition of property.

Tenn. Code Ann. § 36-4-121(b)(2). Marital property is defined in pertinent part as:

(A) [A]ll real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce[.]

(B)(i) "Marital property" includes income from, and any increase in the value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation[.]

Tenn. Code Ann. § 36-4-121(b)(1).

"Nonetheless, it is well-settled that separate property is not indelibly separate; rather, separate property can be treated in 'such a way as to give evidence of an intention that it is to become marital property.'" *Carter v. Browne*, No. W2019-00429-COA-R3-CV, 2019 WL 424201, at *9 (Tenn. Ct. App. Feb. 4, 2019) (quoting *Smith v. Smith*, 93 S.W.3d 871, 875 (Tenn. Ct. App. 2002)); *see also Eldridge*, 137 S.W.3d at 13 ("[S]eparate property can become part of the marital estate due to the parties' treatment of the separate property."). This change can occur through transmutation or commingling. *Eldridge*, 137 S.W.3d at 13. Our Supreme Court has explained transmutation and commingling as follows:

Separate property becomes marital property by commingling if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur.... Transmutation occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property.... The rationale underlying these doctrines

- 8 -

is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002) (citing 2 Homer H. Clark, *The Law of Domestic Relations in the United States* § 16.2 at 185 (2d ed. 1987)). Transmutation often occurs when a spouse purchases real property prior to the marriage and the parties then use the property as the marital residence and undertake significant improvements to the property during the marriage. *See, e.g.*, *Lewis v. Lewis*, No. W2019-00542-COA-R3-CV, 2020 WL 4668091, at *4 (Tenn. Ct. App. Aug. 11, 2020) (collecting cases); *Carter*, 2019 WL 424201, at *12 (concluding that home owned by wife prior to marriage became marital property through transmutation when "parties made the decision to improve the property together [and used] marital funds to make purchases for the renovations"); *Hayes v. Hayes*, No. W2010-02015-COA-R3-CV, 2012 WL 4936282, at *12 (Tenn. Ct. App. Oct. 18, 2012) (holding that home purchased by wife prior to marriage converted into marital property after "both parties borrowed money from the equity in the home" and "[h]usband consistently made significant improvements to the home"). We look to the following factors to determine whether a home owned by a spouse prior to marriage has become marital property through transmutation:

> (1) the use of the property as a marital residence; (2) the ongoing maintenance and management of the property by both parties; (3) placing the title to the property in joint ownership; and (4) using the credit of the non-owner spouse to improve the property.

*Hayes*, 2012 WL 4936282, at *12 (citing *Fox v. Fox*, No. M2004-02616-COA-R3-CV, 2006 WL 2535407, at *5 (Tenn. Ct. App. Sept. 1, 2006)). No single factor is determinative, and whether transmutation has occurred depends on the particular facts and circumstances of each case. *Id.*

In the present case, the parties dispute the classification of several assets. We begin with the real properties.[8]

---

[8] At the outset of this section, we note that at times during the litigation the parties have disagreed on the exact value of the real properties at issue as well as the exact amount spent on renovations and improvements. Nonetheless, the trial court made findings regarding the value of each of the real properties as well as the amount of money spent improving them. Neither Husband nor Wife has raised as an issue on appeal the trial court's valuation of the real properties or their improvements, and as such we do not reevaluate those findings here.

## a. The Lookout Point residence

On appeal, Husband argues that the trial court correctly classified the Lookout Point residence as his separate property, while Wife asserts that the home became a marital asset through transmutation.  Addressing the Lookout Point residence, the trial court found, in relevant part, the following:

> This Court finds the residence located at 10900 Lookout Point was owned by the Husband prior to the marriage and was purchased by him in 1989 for approximately $339,000.00. The mortgage for the Lookout Point residence was paid off approximately three years into the marriage. The Court finds that Husband never transferred nor intended to transfer title of this property to Wife. This Court also finds that Wife's credit was never used to purchase, or improve the marital residence. . . .The monies used for the upkeep and maintenance in the operation of the marital home came from the parties' joint funds which were earned by the Husband during the marriage and prior to the time of the separation.
>
> This Court finds Husband has continued to pay the taxes on the marital residence since the time of the parties' separation in October of 2010. Also, approximately $169,911.20 was spent on renovations and improvements of the marital residence during the time of the marriage. The most recent appraised value of the marital residence was $600,000.00.
>
> The marital residence was purchased by Husband in 1989 as separate marital property and Husband has continued to treat it as separate marital property and no transmutation or co[m]mingling has occurred.

Addressing the increased value of the Lookout Point residence, the trial court explained:

> As the Court has previously noted, [the funds for renovation] were expended from the parties' marital funds which were earned by Husband with Wife making no monetary contribution, but contributions in the form of helping to pick out fabrics and other design elements of the renovation and remodeling. No proof of any substantial contribution by Wife to the increase in value was presented.

Having thoroughly reviewed the record, we must conclude that the evidence preponderates against the trial court's finding that the Lookout Point residence remained Husband's separate property.  First, it is undisputed that the parties used the Lookout Point residence as their family home.  Second, both parties contributed to ongoing management and maintenance of the property, both during the marriage and during the period of separation before trial.  It is undisputed that when the parties resided together, Husband

worked long hours and Wife cared for the home as well as the parties' children. The record demonstrates that Wife paid bills for the home out of the parties' joint bank account, helped plan renovations on the home, planted flowers, etc. Wife was also ordered by the trial court early in the litigation to pay for the utilities and maintenance expenses on the home while she and the children continued residing there. The record clearly reflects that Wife contributed greatly to the ongoing management and maintenance of the Lookout Point residence.

The third transmutation factor, whether the home is titled jointly, obviously militates against a finding of transmutation in this case because the Lookout Point residence is titled in Husband's name only. However, it is well-established that "record ownership of an asset does not always control its classification." *Malmquist v. Malmquist*, No. W2007-02373-COA-R3-CV, 2011 WL 1087206, at *25 (Tenn. Ct. App. Mar. 25, 2011); *see also Altman v. Altman*, 181 S.W.3d 676, 680–81 (Tenn. Ct. App. 2005) ("[T]he classification of property does not depend on the state of its record title but on the conduct of the parties."). Moreover, the fourth factor strongly favors a finding of transmutation in light of the proof that the parties did substantial renovations on the Lookout Point residence with marital funds. Wife was heavily involved in the improvement process and often wrote checks out the parties' joint bank account to pay for the improvements. Wife also testified that many of the renovations were done to make the Lookout Point residence more amenable to Wife and the children. For instance, Wife testified that the master bathroom and the laundry room were completely renovated to her specifications and that a play space for the children was added near the laundry room. Although both the trial court and Husband make much of the fact that Wife's credit was never used to fund the improvements, this is inapposite in light of the fact that no party's credit was needed because the renovations were paid for outright with marital funds.[9]

While Husband asserts that he never intended for the Lookout Point residence to become a marital asset, the only evidence offered to this effect was Husband's testimony, which Wife disputed. Absent any additional evidence from Husband, it appears his "intent to keep [the home] as his separate property surfaced only after the demise of the marriage." *Phipps v. Phipps*, No. E2014-00922-COA-R3-CV, 2015 WL 335843, at *5 (Tenn. Ct. App. Jan. 27, 2015). Indeed, Husband's conduct during the marriage suggests otherwise. Under all of these circumstances, we must conclude that the evidence in the record preponderates against the trial court's finding that the Lookout Point residence remained Husband's

---

[9] Taking a position incongruent with both our statutes and well-settled case law, the trial court and Husband also rely heavily on the fact that the money spent on the improvements, although it came from the parties' joint bank account, was earned by Husband with "no financial contribution" from Wife. However, the money used on the improvements was marital. *See* Tenn. Code Ann. § 36-4-121(b)(1)(A) ("'Marital property' means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage."); *Lewis v. Lewis*, No. W2019-00542-COA-R3-CV, 2020 WL 4668091, at *4 (Tenn. Ct. App. Aug. 11, 2020) ("Significant to this case, a spouse's earnings are marital property, regardless of whether they are deposited into a joint or separate bank account.").

separate property. We hold that the evidence preponderates in favor of a finding that the Lookout Point residence became marital property and should have been included in the parties' marital estate for purposes of the trial court's division of property.

### b. The Cabin

With respect to the Cabin, which was also purchased by Husband before the marriage, the trial court found the following:

> Husband purchased the property referred [*sic*] by the parties as [the Cabin] located at 6634 Highway 80 S. in Burnsville, North Carolina, prior to the marriage. . . .Wife's credit was never used to purchase or renovate this property, and Husband never intended to make Wife a co-owner of this property.

> During the time of the marriage, approximately $360,000.00 of marital funds were expended on renovations. Additionally, there was a barn constructed using marital funds on the property that cost approximately $69,000.00. The most recent appraisal of the property is $440,000.00. There is no debt owed on this property.

> The Court finds that Husband purchased the property located at 6634 Highway 80 S. in Burnsville, North Carolina, as separate property and Husband has continued to treat it as separate marital property and no transmutation or co[m]mingling has occurred. It is the Court's opinion the 6634 Highway 80 South property is the separate property of Husband and shall therefore be awarded to him as his separate asset.

> The Court finds there has been an approximate increase in value of $290,000.00 since the purchase of the property in 1993. . . . As this Court has previously noted, approximately $36,000.00 [*sic*] was expended from the parties' marital funds which were earned by Husband, with Wife making no monetary contribution but contributions in the form of helping to pick out fabrics and other design elements of the renovation and remodeling. No proof of any substantial contribution by Wife to the increase in value was presented.

We must again conclude that the trial court's findings are unsupported by the record. Although the Cabin was not used as the primary marital residence, the parties frequented the Cabin on the weekends and during weeks Husband was off work. Husband himself testified that the parties undertook the extensive renovations on the Cabin so that it could be used as a family vacation home sufficient to accommodate the parties' children.

It is also undisputed that at the time Husband bought the Cabin, it was a plot of land with a small, almost makeshift cabin that the previous owner used as a barn. Husband testified that the structure was not a suitable home at the time it was purchased. The record suggests it was not until after the parties married and expended a considerable amount of time and money on the renovations that the Cabin became the valuable real property it is now. Again, both Husband and the trial court rely heavily on the fact that the Cabin was not titled in Wife's name, as well as the fact that Wife's credit was not used to improve the property. Like the Lookout Point residence, however, no party's credit was used to improve the property because the parties were able to pay for all improvements up front. Also like the Lookout Point residence, Wife was heavily involved in the renovations, and they were to done to her specifications. A full kitchen was added, as well as additional bedrooms for the parties' children, which evidences a clear intent to use the Cabin for family purposes. In light of the parties' conduct and their treatment of the Cabin, we are unpersuaded by the fact that the Cabin was not titled in Wife's name. *See Altman*, 181 S.W.3d at 680–81.

The trial court again gives undue weight to the fact that Wife did not financially contribute to the parties' estate during the marriage, noting that Wife's contribution to the improvements to the Cabin came only in the form of "pick[ing] out fabrics and other design elements[.]" However, the record does not support this finding in light of the fact that the improvements were paid for with marital funds. *Lewis*, 2020 WL 4668091, at *4 (explaining that "[a] spouse's earnings are marital property[,]" and that the use of marital funds to improve a property is persuasive evidence of transmutation).

Consequently, we conclude that the evidence preponderates against the trial court's finding that the Cabin remained Husband's separate asset. Rather, the evidence preponderates in favor of a finding that the Cabin became marital property through transmutation and should have been included in the parties' marital estate for purposes of the division of property.

### c. The Church Street property

Finally, the trial court also classified the Church Street property as Husband's separate asset and awarded Wife no share:

> Husband's name was on the deed to the Church Street property prior to the marriage. Husband's brother had granted him a one-half interest in the property via warranty deed dated March 2, 2000. Husband's brother deeded the remaining one-half interest in the property to Husband approximately seven months after the parties married.

Marital funds were used in the approximate amount of $65,000.00 in order to help Husband's brother avoid foreclosure on the property. However, Wife's name was never placed on the deed for the Church Street property, nor was Wife's credit ever used in acquiring this property.

The parties spent approximately $150,000.00 of marital funds in renovating the Church Street property. The appraised value of the Church Street property is $145,000.00. . . . Husband has been paying the taxes on this property as well as utility payments on the property. . . . The Court is aware that approximately $65,000.00 of marital funds were used to avoid foreclosure on this property, and an additional $150,000.00 of marital funds were used for the renovation this property. However, these funds were earned by Husband with no financial contribution by Wife. . . . Therefore, this Court finds Wife is not entitled to any share of this property and it shall be awarded to Husband as his separate property.

Like the Lookout Point residence and the Cabin, we conclude that the evidence preponderates against the trial court's findings as to the Church Street property. It is undisputed that Husband acquired a one-half undivided interest in the Church Street property shortly before the marriage. However, the parties acquired the Church Street property in full *after* they married, using $65,000.00 in marital funds. Consequently, only part of Husband's interest in the Church Street property could be considered separate property because it was acquired before the marriage. *See* Tenn. Code Ann. § 36-4-121(b)(2). The trial court therefore erred in classifying the Church Street property as Husband's entirely separate asset. *See Climer v. Climer*, No. W2018-01910-COA-R3-CV, 2020 WL 468915, at *5 (Tenn. Ct. App. Jan. 29, 2020) ("As a general rule, assets acquired by either spouse during the marriage are presumed to be marital property." (citing *Williams v. Williams*, No. W2018-00800-COA-R3-CV, 2019 WL 1375218, at *6 (Tenn. Ct. App. Mar. 26, 2019))). In any event, this error is inapposite because we conclude that any interest Husband had in the Church Street property as his separate asset became marital property through transmutation.

For the same reasons addressed with regard to the Lookout Point residence and the Cabin, we conclude that the Church Street property transmutated fully into marital property during the marriage based upon the conduct of the parties. The parties used $65,000.00 in marital funds to purchase the property in full in November of 2000, and then proceeded to spend another $150,000.00 in marital funds on substantial renovations. Wife testified that she helped manage the renovations, and Husband did not offer anything to dispute that testimony, nor did Husband dispute that the taxes, utilities, and general upkeep of the Church Street property have been paid for with marital funds. Although it is not clear from the record how much time the parties spent together at the Church Street property, Husband

testified that they purchased the property so that the family might have another place to stay when visiting Burnsville, North Carolina.[10] Yet again, Husband's conduct speaks louder than his uncorroborated assertion at trial that the Church Street property remained separate.

In light of the substantial efforts and marital funds expended on improving the Church Street property, we conclude that the evidence preponderates against the trial court's finding that the Church Street property is Husband's separate asset and find that the property transmutated into marital property during the marriage. *See Lewis*, 2020 WL 4668091, at *4.

"As the proponent of transmutation, Wife [had] the burden of establishing same." *Wright v. Wright*, No. W2018-02163-COA-R3-CV, 2020 WL 1079266, at *10 (Tenn. Ct. App. Mar. 6, 2020) (citing *Nesbitt v. Nesbitt*, No. M2006-02645-COA-R3-CV, 2009 WL 112538, at *9 (Tenn. Ct. App. Jan. 14, 2009)). Wife met her burden by offering proof that the parties treated the Lookout Point residence, the Cabin, and the Church Street property as marital property not only by substantially improving each property, but by improving the properties specifically to make them more suitable for family use. While Husband testified that he did not intend for the real properties to become joint properties, this allegation "surfaced only after the demise of the marriage" and finds no other support in the record. *Phipps*, 2015 WL 335843, at *5. More importantly, the record establishes that Husband's own conduct during the marriage evinced an intention that the real properties be treated as marital. We conclude that the trial court erred in classifying the Lookout Point residence, the Cabin, and the Church Street property as Husband's separate property, and we hold that all three properties should have been included in the parties' marital estate for purposes of an equitable division. The trial court's decision as to the classification of all three properties is therefore reversed.

Having resolved the issues regarding the parties' real properties, we turn to the next asset at issue, Husband's 401(k).

### d. Husband's 401(k)

Tenn. Code Ann. section 36-4-121(b)(2)(A) provides that "[s]eparate property" means . . . [a]ll real and personal property owned by a spouse before marriage[.]" On the other hand, marital property includes "the value of . . . retirement and other fringe benefit rights accrued as a result of employment during the marriage[.]" Tenn. Code Ann. § 36-4-121(b)(1)(B)(ii). With regard to 401(k) accounts, our Supreme Court has previously held that "the portion of a 401(k) account existing on the date of marriage remains separate property." *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 251, 255 (Tenn. 2009); *see also Erdman v. Erdman*, No. M2018-01668-COA-R3-CV, 2019 WL 6716305, at *2 (Tenn. Ct.

---

[10] Father and his family are from Burnsville.

App. Dec. 10, 2019) (noting that premarital balance of husband's 401(k) was "without a doubt . . . his separate property at the time of marriage"). "Once the property is determined to be a pension, stock option, retirement or other fringe benefit right relating to employment, the issue becomes one of determining the value of that benefit that accrued during the marriage." *Snodgrass,* 295 S.W.3d at 247–48. Courts are then "directed by statute to identify gains in a 401(k) attributable to premarital separate property and those gains attributable to contributions made during the marriage." *Erdman*, 2019 WL 6716305, at *3 (citing Tenn. Code Ann. § 36-4-121(b)(1)(B)(iii)). "Indeed, [section 36-4-121(b)(1)(B)(iii)] states as follows:"

> The account balance, accrued benefit, or other value of vested and unvested pension benefits, vested and unvested stock option rights, retirement, and other fringe benefits accrued as a result of employment prior to the marriage, together with the appreciation of the value, shall be "separate property." In determining appreciation for purposes of this subdivision (b)(1)(B)(iii), the court shall utilize any reasonable method of accounting to attribute postmarital appreciation to the value of the premarital benefits, even though contributions have been made to the account or accounts during the marriage, and even though the contributions have appreciated in value during the marriage; provided, however, the contributions made during the marriage, if made as a result of employment during the marriage and the appreciation attributable to these contributions, would be "marital property." When determining appreciation pursuant to this subdivision (b)(1)(B)(iii), the concepts of commingling and transmutation shall not apply[.]

> *Id.* (bracketing in original).

In the present case, the trial court classified Husband's entire 401(k) as a marital asset and ordered the parties to divide it equally:

> The Husband has a 401(k) account that was established prior to the marriage. However, the Court was unable to determine the value of the 401(k), if any, at the time of the parties' marriage. Without being able to determine the value at the time of the marriage, this Court is of the opinion that a fair and equitable division of the 401(k) would be a 50/50 even split between the parties.

On appeal, Husband asserts that the trial court erred in concluding that because it could not determine the exact premarital value of the 401(k) in light of the conflicting evidence, the 401(k) should be classified as a marital asset and divided equally. Because it is clear that Husband's 401(k) was part marital and part separate, we agree with Husband. It is undisputed that Husband's 401(k) has a premarital component that was established before the parties married in 2000. Husband also does not dispute that contributions were

made to the 401(k) during the marriage and that Wife is entitled to a portion of the account. *See* Tenn. Code Ann. § 36-4-121(b)(1)(B)(ii). Consequently, the pertinent issues here are the balance of Husband's 401(k) at the time of the marriage, and the appreciation attributable to the premarital and postmarital contributions. *Erdman*, 2019 WL 6716305, at *3; Tenn. Code Ann. § 36-4-121(b)(1)(B)(iii).

The value given an asset by the trial court is a question of fact that we afford great weight on appeal. *Powell v. Powell*, 124 S.W.3d 100, 103 (Tenn. Ct. App. 2003) (citing *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987)). An asset's value is assigned "by considering all the relevant evidence regarding value[,]" keeping in mind that the parties bear the burden of producing competent evidence of value. *Id*. at 104. When the parties offer conflicting evidence of value, the trial court "may assign a value that is within the range of values supported by the evidence." *Id.* at 106 (citing *Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995)).

At the time of trial, the balance of the 401(k) was $1,391,308.85. Wife testified that she believed the value of the 401(k) at the time of marriage was $385,000.00. Wife also offered a 2003 statement from the 401(k) reflecting that the balance was $468,000.00 as of May of 2003. Husband testified that he believed the balance of the 401(k) at the time of marriage was $656,080.66, but offered no further proof as to that amount.[11] Accordingly, depending upon which party's proof the trial court credits, the range of values supported by the evidence as to the premarital component of the 401(k) was $385,000.00 to $656,080.66. Neither party, however, offered proof as to the appreciation attributable to the premarital value or the postmarital contributions, nor did the trial court make any findings on same.

In light of the undisputed evidence that Husband's 401(k) has a premarital component that remained his separate asset, the trial court's decision to classify the entire 401(k) as a marital asset is an error of law that warrants reversal. *See Snodgrass*, 295 S.W.3d at 251 ("That portion of a 401(k) account existing on the date of marriage remains separate property."); *Erdman*, 2019 WL 6716305, at *2 ("[P]roperty cannot be included in the marital estate unless it meets the definition of 'marital property' contained within the Tennessee Code." (quoting *Bewick v. Bewick*, No. M2015-02009-COA-R3-CV, 2017 WL 568544, at *7 (Tenn. Ct. App. Feb. 13, 2017))); *see also Eldridge*, 137 S.W.3d at 12 (noting that a trial court's classification of assets may be reversed when based on an error of law). The trial court's classification of Husband's 401(k) must be reversed and remanded so that the trial court can determine the premarital value of the 401(k), as well as the appreciation

---

[11] Husband attempted to offer further evidence regarding the balance of his 401(k) at trial; however, Wife's counsel objected on the ground of completeness because a portion of the account statement was missing. The trial court sustained Wife's objection. Husband has not raised the trial court's ruling on that objection as an issue on appeal. Consequently, the only evidence in the record from Husband as to the value of the 401(k) at the time of marriage is his own testimony.

attributable to the premarital and postmarital contributions.[12]  Tenn. Code Ann. § 36-4-121(b)(1)(B)(iii).

## 2.  Equitable Division

"The division of marital property is essentially a three-step process."  *Melvin v. Johnson-Melvin*, No. M2004-02106-COA-R3-CV, 2006 WL 1132042, at *10 (Tenn. Ct. App. Apr. 27, 2006).  The first step, which we have already addressed, requires the trial court to classify the parties' property as separate or marital, and the second step is to value the marital property.  *Id.*  The final step is to equitably divide the marital property in accordance with the factors provided in Tenn. Code Ann. section 36-4-121(c).  *Id.*  "Following this approach generally yields consistent and equitable results."  *Id.*

In the case at bar, the first step in this equation, classification, was substantially incorrect.  This Court has previously held that when a significant marital asset's classification changes on appeal, it may be necessary "to remand the case to the trial court for reconsideration of its equitable division of the marital estate in light of" the holding.  *See, e.g.*, *Carter*, 2019 WL 424201, at *12 (vacating and remanding the trial court's division of marital property based upon the reclassification of a significant piece of real property); *Hayes*, 2012 WL 4936282, at *13 (same).

Here, several assets of substantial value have changed classification on appeal, and such significant changes to "the marital estate may change the manner in which the trial court would choose to divide the rest of the parties' assets and debts."  *Hayes*, 2012 WL 4936282, at *13.  Accordingly, we deem it prudent to remand the case to the trial court for reconsideration of its equitable division of the marital estate.  *Id.*

While we have concluded that the trial court must reconsider the equitable division of marital property on remand, Wife has raised an independent issue regarding equitable division that can be decided on appeal.  Specifically, Wife asserts that Husband dissipated marital assets through irresponsible investment strategies after the parties separated.  Because the trial court made detailed findings of fact and conclusions of law on this issue, and in the interest of resolving this protracted litigation, we will consider whether the trial court correctly reached its conclusion on this narrow issue.

Whether a party has dissipated marital or separate assets is one of the factors a trial court should consider in equitably dividing a marital estate.  Tenn. Code Ann. § 36-4-121(c)(5).  Regarding dissipation of assets, our Supreme Court has previously explained:

---

[12] In its discretion, the trial court is free to take additional proof, including expert proof, to resolve this issue.  *Erdman*, 2019 WL 6716305, at *3.

Whether dissipation has occurred depends on the facts of the particular case. 24 Am. Jur. 2d Divorce and Separation § 526 (2009). The party alleging dissipation carries the initial burden of production and the burden of persuasion at trial. *Burden v. Burden*, 250 S.W.3d 899, 919 (Tenn. Ct. App. 2007), *perm. to app. denied*, (Tenn. Feb. 25, 2008). Dissipation of marital property occurs when one spouse wastes marital property and thereby reduces the marital property available for equitable distribution. *See Altman v. Altman*, 181 S.W.3d 676, 681–82 (Tenn. Ct. App. 2005), *perm. to app. denied*, (Tenn. Oct. 31, 2005). Dissipation "typically refers to the use of funds after a marriage is irretrievably broken," *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006), is made for a purpose unrelated to the marriage, and is often intended to "hide, deplete, or divert" marital property. *Altman*, 181 S.W.3d at 681–82. In determining whether dissipation has occurred, trial courts must distinguish between dissipation and discretionary spending. *Burden*, 250 S.W.3d at 919–20; 24 Am. Jur. 2d Divorce and Separation § 526 (2009). Discretionary spending might be ill-advised, but unlike dissipation, discretionary spending is typical of the parties' expenditures throughout the course of the marriage. *Burden*, 250 S.W.3d at 919–20.

*Larsen-Ball v. Ball*, 301 S.W.3d 228, 235 (Tenn. 2010). Whether dissipation has occurred is a fact-specific analysis, but the most common factors to consider include:

(1) whether the expenditure benefitted the marriage or was made for a purpose entirely unrelated to the marriage; (2) whether the expenditure or transaction occurred when the parties were experiencing marital difficulties or were contemplating divorce; (3) whether the expenditure was excessive or de minimis; and (4) whether the dissipating party intended to hide, deplete, or divert a marital asset.

*Altman*, 181 S.W.3d at 682 (citing *Halkiades v. Halkiades*, No. W2004-00226-COA-R3-CV, 2004 WL 3021092, at *4 (Tenn. Ct. App. Dec. 29, 2004)).

Here, Wife's dissipation claim is based on proof showing Husband engaged in high-risk investing after the parties separated, resulting in losses to the overall marital estate. Both parties offered expert proof at trial regarding Husband's investment strategies, and the trial court made the following relevant findings:

Much argument has been made concerning Husband investing in high risk investments. However, it is not this Court's position to judge the investment acumen of Husband. There was no testimony presented to show Husband made these high risk investments with the intent of dissipating the marital estate.

The trial court's findings are supported by the record as to this issue. While Wife offered expert proof at trial that Husband's investment decisions after the demise of the marriage were fairly risky and resulted in losses to the marital estate, Husband offered competing proof that he was simply following the advice of his longtime financial advisor. Wife offered no proof that Husband's intent was to drain or deplete marital assets, and Husband testified that this was never his intention. Although we agree with Wife that Husband's actions were not ideal given the circumstances, the record shows that his behavior "was typical of the parties' expenditures throughout the course of the marriage." *Larsen-Ball*, 301 S.W.2d at 235. Indeed, Husband testified that he lost money in the stock market both before and during his marriage to Wife, and Wife offered nothing to dispute this testimony. There is simply no evidence in the record that Husband's investment decisions made after the parties separated were made with intent to deplete marital funds or different from his behavior during the marriage.

Accordingly, we conclude that the evidence does not preponderate against the trial court's finding that Husband did not dissipate the marital estate as a whole through his investment strategy, and this portion of the trial court's ruling is affirmed.

One final note is in order regarding equitable division of the parties' marital estate on remand. In its amended findings of fact and conclusions of law addressing division of the parties' property, the trial court repeatedly states that Wife made no financial contributions to the family, and at several points notes that the money in the parties' joint checking account was money earned by Husband, through his employment, with no contribution from Wife. In the trial court's conclusions addressing division of property, the only reference to Wife's contributions to the marriage is a brief statement: "Wife's contribution to the family has been as a homemaker and otherwise limited her contributions financially to the family and marriage." The trial court's conclusions addressing the division of property ascribe more weight to Husband's role as wage earner than to Wife's role as homemaker.[13] Wife, however, has been the sole caregiver to the parties' children because Husband has not had contact with the children in several years and has not had unsupervised visitation with them since 2010. Contrary to the findings of the trial court and Husband's contentions on appeal, Wife's contribution to the family has been both meaningful and substantial.

We need not expound further on this issue in light of our decision to vacate and remand the division of the parties' marital estate; however, failure to consider Husband's

---

[13] Much of the problematic language in the trial court's order appears to have been adopted almost verbatim from Husband's proposed findings of fact and conclusions of law. This trial court has previously been cautioned regarding the perils of entering findings and conclusions "nearly identical to those submitted by [counsel.]" *F&M Mktg. Servs., Inc. v. Christenberry Trucking and Farm, Inc.*, No. E2015-00266-COA-R3-CV, 2015 WL 6122872, at *7 (Tenn. Ct. App. Oct. 19, 2015). Those perils are particularly evident here because Husband's proposed findings and conclusions place more weight on Husband's role as wage earner, a clear error of law.

and Wife's contributions equally would be a serious error of law in light of the longstanding policy recognizing "the equal dignity and importance of the contributions to the family of the homemaker and the breadwinner."  *Shackelford v. Shackelford*, No. M2018-01178-COA-R3-CV, 2019 WL 2151684, at \*12 (Tenn. Ct. App. May 16, 2019); *see also* Tenn. Code Ann. § 36-4-121(c)(5)(a) (providing that contributions of the homemaker and wage earner are given the same weight in the division of property if each party fulfills their role).  It is our sincere hope that the trial court will remedy this error in dividing the marital estate on remand so as to avoid future appeals.

## B.  Wife's Post-Trial Motions

We turn next to Wife's post-trial motions, in which Wife essentially asked the trial court to revise its findings of fact and conclusions of law based upon Wife's averment that Husband depleted two marital assets between the conclusion of trial and the entry of the final order.[14]  Wife's first motion was filed on May 25, 2018, and alleged that Husband had used the parties' joint checking account, which was undisputedly a marital asset, entirely on Husband's own expenses, including his support obligations.  Later, but still before the entry of the final decree of divorce, Wife made the same request with regard to Husband's 401(k), from which Wife alleged Husband had withdrawn $163,000.00 since trial.[15]

At the outset, we note that Wife has couched her motions as Rule 59.04 motions to alter or amend a judgment.  However, at the time the motions were filed, there was no final order because the issue of child support was not resolved and the final decree of divorce had therefore not been entered.  *See Shofner v. Shofner*, 181 S.W.3d 703, 712 (Tenn. Ct. App. 2004) ("A final judgment is primarily one that fully adjudicates all the claims between all the parties." (citing Tenn. R. App. P. 3(a))).  The trial court's order was interlocutory at the time and, consequently, Wife's motions were substantively motions to revise an interlocutory order pursuant to Tenn. R. Civ. P. 54.02.  *See Harris v. Chern*, 33 S.W.3d 741, 744 (Tenn. 2000) (explaining that Rule 54.02 addresses interlocutory orders and "confers upon the trial court 'the privilege of reversing itself up to and including the date of entry of a final judgment'" (quoting *Louis Dreyfus Corp. v. Austin Co.*, 868 S.W.2d 649, 653 (Tenn. Ct. App. 1993))); *Carter v. Carter*, No. M2012-00342-COA-R3-CV, 2012 WL

---

[14] It appears from the record that the substantial delay in entering the final order in this case is due to the trial court declining to rule on child support and instead referring that issue to a child support magistrate.  Child support was not fully decided until May of 2019, over two years after the conclusion of trial.

[15] Wife's second motion does not appear in the record.  However, it is otherwise clear from the record that Wife raised this issue in the trial court, and Husband has not asserted that Wife waived this issue.  We therefore consider whether the trial court erred in denying Wife's second motion, notwithstanding the absence of the actual motion from the record.  *See First Cmty. Bank, N.A. v. First Tennessee Bank, N.A.*, 489 S.W.3d 369, 401 (Tenn. 2015) ("[D]etermining whether parties have waived their right to raise an issue on appeal should not exalt form over substance . . . [a]ppellate courts must carefully review the record to determine whether a party is actually raising an issue for the first time on appeal." (quoting *Powell v. Cmty. Health Sys.*, 312 S.W.3d 496, 511 (Tenn. 2010))).

6743816, at *9 (Tenn. Ct. App. Dec. 28, 2012) (applying Rule 54.02 in the context of a post-divorce matter and noting that "a non-final order is subject to revision at any time before the entry of the judgment"). We treat Wife's motions according to the substance rather than Wife's characterization. *Ferguson v. Brown*, 291 S.W.3d 381, 387 (Tenn. Ct. App. 2008); *In re Estate of Vaughn*, No. W2018-01600-COA-R3-CV, 2019 WL 3812419, at *6 (Tenn. Ct. App. Aug. 14, 2019) (collecting cases in which this Court considered Rule 59.04 motions under Rule 54.02 when the timing of the motion rendered Rule 54.02 applicable). In so treating Wife's motions, we review the trial court's denial of the motions for an abuse of discretion. *Harris*, 33 S.W.3d at 746. Under this standard, the trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision[.]" *Discover Bank v. Morgan*, 363 S.W.3d 479, 487 (Tenn. 2012) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)).

On appeal, Wife asserts that the trial court erred in denying her motions to revise and asks this Court to enter a judgment in her favor for $127,500.00, half the value of the joint checking account as it existed at the time of trial, as well as an additional $163,000.00 offset to account for the money spent from the 401(k). The record reflects that Husband does not dispute spending Wife's portion of the joint bank account, although he asserts that his spending was appropriate because it went towards Wife's support payments. Wife argues that by Husband's logic, she has been forced to pay for half of her own support because the money for her alimony has been paid from a marital asset, rather than being paid out of Husband's many separate assets. The record does not reveal the reasons for Husband's withdrawals from the 401(k).

Unfortunately, we are without the benefit of any findings or analysis explaining the trial court's reason for denying Wife's motions, rendering it difficult to determine whether reasonable minds can disagree as to the decision. *See Trezevant v. Trezevant*, 568 S.W.3d 595, 622 (Tenn. Ct. App. 2018) (noting that this Court cannot determine whether a trial court abused its discretion in the absence of factual findings by the trial court). Although there is no dispute that the trial court heard Wife's motions prior to entering the final decree of divorce, the trial court did not enter an order on the motions. Rather, the final decree states that all outstanding motions are dismissed and that the parties' joint bank account and the 401(k) are marital assets that should be divided equally. So, although the trial clearly denied Wife's motions, neither the final decree nor the amended findings of fact and conclusions of law provide any explanation as to why.[16]

---

[16] After the final decree of divorce was entered on September 26, 2019, a notice of appeal to this Court was filed within thirty days. Well after the filing of the notice of appeal, on December 2, 2019, the trial court entered an order titled "Order From Hearing Prior to Entry of Final Order for Divorce[,]" in which the trial court purportedly denied Wife's requests by stating that "Wife should not be entitled to an offset for the funds withdrawn after the trial but before the entry of the Final Judgment." We need not reach the issue of whether the trial court retained subject matter jurisdiction to enter such an order because the trial court had already denied all outstanding motions in its final decree. In any event, the December 2,

- 22 -

Considering the foregoing, we simply cannot conclude that the trial court correctly denied Wife's motions, primarily because the trial court made no findings of fact or conclusions of law addressing its ruling. *See Harris*, 33 S.W.3d at 754 (noting that when trial courts rule on a Rule 54.02 motion, they "should make adequate findings of fact and conclusions of law on the record to support their rulings"); *Trezevant*, 568 S.W.3d at 622 (explaining that when this Court is "left to wonder about the trial court's decision[,]" we are unable to conduct a meaningful appellate review). Husband has admitted to spending Wife's portion of the joint checking account on her own spousal support and, as we perceive it, Husband's actions warrant judicial attention in the trial court's overall distribution of marital property. This is especially true in light of the fact that the parties agree that the checking account has been depleted entirely, and "by statute courts must rely on the values of marital property as close in time as possible to the division of marital property." *Trezevant*, 568 S.W.3d at 623; *see also Barton v. Barton*, No. E2019-01136-COA-R3-CV, 2020 WL 6580562, at *11 (Tenn. Ct. App. Nov. 10, 2020) ("Time does not stand still, and we are mindful of the fact that the 'value placed on marital property should, as near as possible, reflect the value of the property on the date that it is divided.'" (quoting *Dobbs v. Dobbs*, No. M2011-01523-COA-R3-CV, 2012 WL 3201938, at *3 n.3 (Tenn. Ct. App. Aug. 7, 2012))).

Nonetheless, we are unable to determine from the record whether the trial court abused its discretion in the absence of factual findings or conclusions of law. Moreover, because the overall division of marital property is vacated and remanded for reconsideration, we conclude that the trial court's decision to deny Wife's motions should also be vacated and remanded for further consideration. On remand, the trial court must make findings of fact and conclusions of law regarding whether Wife is entitled to any offsets based upon Husband's post-trial spending, and determine whether and to what extent those findings affect the overall redistribution of the marital estate.[17]

## C. Spousal Support

Turning to the issue of alimony, the trial court awarded Wife $5,000.00 per month for thirty-six months as alimony in solido and denied Wife's request for attorney's fees. While Husband asserts that the trial court erred in granting Wife alimony at all, Wife posits

---

2019 order is inapposite because the trial court's findings as to this issue in both the final decree of divorce and the December 2019 order are insufficient for meaningful appellate review.

[17] The extent to which the trial court needs updated proof as to the valuation of the bank account, the 401(k), and the remainder of the parties' assets is left to the discretion of the trial court. *See Barton*, 2020 WL 6580562, at *11.

that she should have been awarded alimony in futuro and that the trial court erred in declining to award Wife her attorney's fees.[18]

When a trial court determines whether and to what extent alimony is appropriate, it must apply the statutory factors enumerated in Tenn. Code Ann. section 36-5-121(i). Rather than tax the length of this opinion with a discussion of these factors, we note at the outset that one of the alimony factors is "the provisions made with regard to the marital property, as defined in § 36-4-121." Tenn. Code Ann. § 36-5-121(i)(8). The trial court must consider the manner in which the marital estate is divided when determining alimony, and "the trial court may award spousal support only after the court has equitably divided the parties' marital property." *Trezevant*, 568 S.W.3d at 624; *see also Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997) ("A spouse with adequate property and income is not entitled to an award of additional alimony[.]"). As such, it is sometimes necessary to remand a trial court's decision on alimony "by virtue of the need to re-evaluate the marital estate." *Id.*; *see also Barton*, 2020 WL 6580562, at *11 (vacating the trial court's award of attorney's fees to wife after determining that issues of estate valuation and distribution required reconsideration).

In the present case, our decision to remand this matter for reconsideration of the division of marital property substantially alters the equities between the parties; accordingly, Wife's need for and Husband's ability to pay alimony may very well change on remand as well. Although this may not ring true for every case, it is especially true here because neither party has worked in many years nor has plans to work. The property each party takes with them from the marriage, therefore, will very much dictate their financial standing. Consequently, we vacate and remand the trial court's decision as to alimony and Wife's attorney's fees.

### D. Attorney's Fees Incurred on Appeal

Finally, Wife asserts that she is entitled to attorney's fees on appeal. This decision is soundly within the discretion of this Court. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). "When considering a request for attorney's fees on appeal, we also consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the requesting party sought the appeal in good faith, and any other equitable factors relevant in a given case." *Chaffin v. Ellis*, 211 S.W.3d 264, 294 (Tenn. Ct. App. 2006) (citing *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005)). Under all of the circumstances of this case, we respectfully decline to award Wife her attorney's fees incurred on appeal.

---

[18] In divorce proceedings, an "award of attorney's fees to an economically disadvantaged spouse is generally considered an award of alimony in solido." *Trezevant*, 568 S.W.3d at 624 (citing *Gonsewski v. Gonsewski*, 350 S.W.3d 99 (Tenn. 2011)).

## Conclusion

The judgment of the Knox County Chancery Court is hereby reversed in part, affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed equally between the appellant, Norris L. Dover, and the appellee, Louise Helen Pack Dover, for which execution may issue if necessary.

_____

KRISTI M. DAVIS, JUDGE